Good morning, all. Our first case for argument this morning is Film On X v. Window to the World Communication. Mr. Baker. Thank you, your honors. May it please the court. My name is Ryan Baker. I represent the plaintiff appellant Film On X. In the Copyright Act of 1976, Congress struck a balance between the interests of the copyright holder, on the one hand, and the governmental and public interests in the public good of broad access to free-to-air broadcast television, on the other hand. Section 111 reflects that balance, creating a compulsory license for cable companies as defined in Section 111F3 of the 1976 Act. Because Film On X meets all of the unambiguous statutory requirements in that provision, Film On X qualifies as a cable system under Section 111 and is therefore entitled to a compulsory license. To exclude Film On X from the benefits and the public from the related benefits of that compulsory license, the district court followed the arguments of the appellee here into conflating various elements of what it means to be a cable system under Section 111. And specifically, there's a conflation of what a facility is and what a communications channel is. In other words, what a facility is and what a facility does. They are different. They are not the same. Well, it is true, isn't it, that only the end user, the subscriber to Film On's services, is able to see the broadcasted data? That is exactly right, Your Honor. And that emphasizes the conflation. Based on, well, first the district court concludes that as a matter of law, in the record at page 14, that the individual actually receives the signal. And that's what Your Honor just said. Only the individual can see the signal, the broadcast. Because it's transmitted in packets across cables, wires, and microwave, or the internet. You said unambiguous. You used the word unambiguous. Because is there an ambiguity necessary to get into all of that discussion? There's no ambiguity in the statute, Your Honor. And therefore, we don't need to get into things like legislative history or the opinions of the Copyright Office, which we can discuss. But we don't even need to get there because the statute is plain and unambiguous. And it's clear that when the statute was written in 1976, it was written in response to dramatic technological evolution that had occurred since 1909, when the prior copyright statute was enacted. And it was meant to address changing technology. It was made in response to Fortnightly and Teleprompter, which were then disruptive technologies, then technologies that were changing the industry. Now, of course, they're old technologies. They're antiquated technologies. And so today, we have new technologies that are more efficient for the consumer, that are technologies that frankly address the exact same concerns that cable television addressed in 1976. And by that, Your Honors, I mean in 1976, one of the concerns was people who lived in rural areas who couldn't see broadcast television. And as I said, this was already determined to be a public good. There was a responsibility of all those who were companies or entities who were permitted to transmit on the public airwaves that they provide their signals to the public. These people in rural areas could not see those signals. Today, it's different. Today, there's satellite television under Section 119 and Section 122. There are cables going every which way that are interconnected. And then there's the Internet, which operates on those same cables that are connected around the world. And today, many people don't have a satellite dish, and they don't have cable television. A lot of new apartments and high-rise buildings, there's no cable jack in the wall, the old cable thing that had the wire sticking out that you had to screw in and fiddle with for a while. It doesn't exist in a lot of places, but everybody has the Internet. And a lot of people today rely solely on the Internet to access the public good of broadcast television. Is there a necessity for control over that medium? There is a necessity for control, and the FCC is tasked with controlling, in this instance, the distribution of television, as we've highlighted in our papers. The FCC has an item, an NPRM, currently on the desk, but still on the desk. It's still an active open item as to whether or not it should regulate actively OTT MVPDs, over-the-top, meaning on-the-Internet providers of multi-channel video programming service. So the FCC is the entity that's tasked with stepping in and regulating. The job of the court today is to independently give a fresh look to the statutory language and give that statutory language life. And the only way to give that life is to avoid reading in additional requirements, which is exactly what the district court did here, which is what the Copyright Office has urged everyone to do. And getting back to the initial point I was going to make, the conflation between what a cable system is and what it does. Well, and I appreciate that you've given, you know, that we understand the history and the evolution from 76 to now, but doesn't the addition of the term microwave to the definition suggest that Congress did not intend for a broad definition of cable system? Well, I think it's the opposite, Your Honor. And I think in order to highlight why it's the opposite, we need to look at the legislative statements surrounding what happened with the microwave addition to the statute. And there in that instance, the Copyright Office, which notably in every instance when it's been presented with a new form of transmission, or let's just say an other communications channel, because remember, the cable system has to transmit in a certain way. The facility needs to transmit by wires, cables, or other communications channels. And in every instance, when an other communications channel, like microwave, was presented to the Copyright Office for a compulsory license, the office rejected it. As the court in the Central District of California observed, the hostility of the Copyright Office is well documented and it's existed since the, towards Section 111, rather, has existed since the inception of that act. And it's even as recent as 2008 in the Shavira Report. Again, the first thing, one of the first things the office says is we should abolish all compulsory licensure. So going back to the microwave point, though, looking at the reason that the Congress had to step in and act, and they stated the 1994 amendment overturns an erroneous interpretation of the definition of cable system by the Copyright Office, an interpretation which denied license to microwave carriers. The definition of cable system has also been amended, including the term microwave, which was necessary because of an unnecessarily restrictive interpretation. So Congress was forced to act by the Copyright Office. Now contrast what happened there when the Copyright Office had engaged in formal notice rulemaking with what's happened here. Here, when the Copyright Office in this case and related cases in California and Washington, D.C., was presented with Film on X's license filings and fees, the office didn't reject them. It received them provisionally. And in so doing, stated that the reason that it was receiving them provisionally and not rejecting them was because the issue had been raised before the courts. Now, in terms of the amendment, I want to get back to that and ask you another question. Doesn't Congress's action by amending the act contain a separate section pertaining to satellite transmissions also weigh against your arguments that the section applies to Internet retransmissions? Well, no, it doesn't, Your Honor. There was a wholly different set of litigation that was occurring in the 11th Circuit. And while that litigation was ongoing, again, the Copyright Office made a formal regulation to say satellites are not entitled to license. But even actually taking a step before that, just so I have the chronology right, while that litigation was pending, Congress enacted Section 119 in 1988. And in doing that, it created a separate license for satellite systems. And the reason that it did that was because the transmissions of satellites, which are woefully different than what's provided for specifically in the act, in that they come from outer space and that the facility is in outer space, which is one of the issues that the court in the 11th Circuit was grappling with. So in light of those things, in order to avoid, I suppose, confusion, Congress created Section 119. But it's important to note, Your Honor, that even when Congress created Section 119 for satellites, it specifically stated that the creation of that separate statute should not be interpreted to mean that the satellite systems were not also entitled to a license under Section 111. So there we have Congress saying we're going to create something new because this is so unique and different, but at the same time, it doesn't mean that 111 doesn't apply. What ultimately happened with satellites was the 11th Circuit found that, by the way, the 11th Circuit, after there was some rulemaking by the Copyright Office, declined to follow the Copyright Office and said that, yes, satellite systems are in fact entitled to a compulsory license under Section 111. Then the Copyright Office issued a formal rulemaking. The case went back to the 11th Circuit, and at that point, the 11th Circuit applied Chevron deference and deferred. That's an important point because in the papers that WTTW has submitted to the court, they argue that every circuit that's considered this issue has applied Chevron deference. That's false. The first satellite case did not apply Chevron deference, and all of the district courts that have considered this case have not applied Chevron deference. So Chevron deference, including this district court, which it was right to do, and that was the only conclusion that was right. The rest of the conclusions, that Film On X is not entitled to a compulsory license because somehow it has to control the distribution medium. In other words, there has to be a literal wire that it controls going from the head end of its facility all the way to each end user. Your Honors, any one of us can go outside and turn on our phone or our iPad, and we can watch broadcast television. Nobody can seriously contend that there is some sort of a cable or that your cable provider controls the network that's going to my phone or my iPad standing outside this courthouse. It simply doesn't exist. Does it still control the customer when using the Internet? Yes, there are ways to. In order for someone to pay for whatever copyright material they get. Yes, Your Honor, there are ways to track where the customer is, to geolocate that person and make sure that other rules and regulations are being respected to the extent that they apply. Of course, here, the FCC's rules and regulations do not yet apply, which, again, under this first satellite case in the 11th Circuit, means that Film On X also satisfies the permissible requirement under the rules and regulations of the FCC because it's not actively regulated. But there are certainly ways, and the record is replete with all of the efforts that Film On X has made to comply with or to offer what it will do to comply with FCC rules and regulations if and when they apply. And that's an important point to make in light of one of the cases that's been cited by courts that have gone against Film On X in these cases and also that went against Aereo. That's IVI. And the IVI case is important to distinguish for a variety of reasons. First and foremost, as I was saying, IVI had no intention and stated that it would not comply with the FCC rules and regulations. More importantly, the evidence on the record in the Second Circuit actually states, and it's in footnote 6 of the IVI opinion, there was no evidence. There was no evidence of the nature or the location of their facility. That's a fundamental requirement of Section 111. There must be a facility in a state, province, or territory. That facility, again, needs to receive over-the-air signals, needs to retransmit them, and then we get to how does it retransmit them. The statute is clear. By using wires, cables, or other communication channels. And where does it transmit them? To subscribers. So the conclusion that this report reaches is somehow that Film On X transmits to the Internet and then the Internet goes on and transmits something to the end user is nonsense. It must be rejected. And it reads, again, it reads an additional requirement into the statute. It's important to note in that regard Congress knew how to draft a statute that required what's called a closed transmission path, which is what the WTTW is arguing here, which is what the district court is teaching us is required by the Copyright Act, by Section 111. Well, let me ask you this. Isn't it possible that Congress intended the act to be broad, but Section 111 or 111 to be narrowly construed, like your opponents argue? That is certainly possible, and there is a canon of statutory construction which provides that the general rule or the protection is broad and the exceptions are to be narrowly construed. I want to draw the Court's attention to one case that's not in the papers on that point, and it's a recent Second Circuit case called Capital Records v. IMEO. How recent is that? It's the end of 2016, last year. Well, that should have been supplemental authority, shouldn't it? It should have, Your Honor. Unfortunately, I wasn't made aware of it until recently, and I'd like to draw the Court's attention to it and the Court can consider it. Well, how recently did you become aware? Yesterday, actually, Your Honor, and I apologize to the Court for that. Opposing counsel should be made aware of it also. Okay. Did you give notice to opposing counsel? I did not, so I will not talk about that case. I have one question. I don't want to interrupt you, but Verizon and AT&T, do they use the Internet similar to what your client would? They do, Your Honor. Is that a valid question, first of all? They do, Your Honor, and although the appellees here will contend that they use something called IPTV as opposed to using the Internet, IPTV is an Internet protocol that, in fact, is a way of using the Internet. And when they argue that IPTV operates over a network, that network is the Internet, and the evidence in the record is that our experts, first of all, agree that the physical layer of the Internet is made up of wires, cables, and microwave. Well, it seems like the addition that you're complaining about is, one, I think they talk about when you go to the consumer, it says, I don't know what it means or anything, directly to. Does that change anything by being more specific? Maybe that's not a question that we worry about. That's not in the statute, but I don't think that matters, Your Honor. I think that these transmissions go directly to the consumer, and the fact that PhilmonX may not control or own the entire transmission path, in NFL v. Insight it was found that in Section 111 didn't require that because Insight Communications, which was a passive carrier under Section 111, did not control the entire path. There was some other entity that had a part of that, and so that transmission that they were providing went from their hands to someone else to the end receiver, and that was okay. And here it's okay as well. Control seems to be the add-on that you don't like, that you object to. It's not in the definition. I wouldn't say it's control, Your Honor. I think it's ownership. And they will contend that AT&T and Verizon have a managed network. There's no evidence of what that means. And at the end of the day, the important consideration here is we transmit a signal. It is only received by the end user. That's it. We have a facility that receives a signal. It's here in Chicago. It retransmits. It retransmits with wires, cables, and other communications channels, and it's received by a paying subscriber. And that's the end of the story. And I see I've gone into my reserve time, so I'll let. Mr. Baker, I don't want to preclude you from submitting additional authority. So you can submit a case, but, of course, there must be notice given to Mr. Stone. I will do that. I will do that afterwards, Your Honor. Thank you. All right, thank you, Mr. Baker. Mr. Stone. Good morning, and may it please the Court, Richard Stone for appellee. Let me start first by dispelling, I think, somewhat of an illusion here. The argument was made that Philmon is necessary as a technological disruptor and to serve consumers. Let me be clear. They are not doing anything technologically new. The only thing new they are trying to do is to create a loophole in the law for a compulsory license. It is correct, as counsel put at the end of his argument, you can obtain television over the Internet. It's ubiquitous today. The reason being there are market-negotiated licenses for that content, such as Hulu, Amazon Prime. Even cable companies enter into market licenses nowadays so that cable companies can separately stream over the Internet. So the services provided by AT&T and Verizon, how are those different? Well, there's two components to that, and to use the word conflation, which we've heard today, what counsel has done is conflated it. So AT&T and Verizon, when they send signals to your television as a cable system, they are using Internet protocol TV, which is a language that allows devices to communicate over a network, a network that they completely control. We know that that was discussed in the IV-1 case, and it's discussed in the legislative history for the satellite as well. But in any event, AT&T and Verizon, when it goes to your television set, use a language, but they control that network just like any other cable system. Separately, they will stream to, for example, your phone, television via the Internet to your phone, but that is pursuant to a license they negotiate with the programmers. And so what we're arguing about today is they want to come in and avail themselves of a government-imposed compulsory license. And it's no fluke that six separate courts, senators Hatch and Leahy, the Copyright Office, and the former Register of Copyrights, Mr. Oman, have all agreed with Appellee that the cable compulsory license is not available to Internet retransmitters. And the starting point for all of this is what is the legal lens through which we look at Section 111 and particularly this compulsory license? Well, we know that Section 111 is a limitation on the broad exclusive rights given to copyright holders, and we know that it's settled law that such a limitation must be viewed narrowly.  Secondly, within Section 111 is 111F3. That is the industry-specific compulsory license. Courts recognize that a compulsory license is in derogation of the rights of the copyright holders. Therefore, courts have held consistently that a compulsory license must also be construed narrowly. So when we look through the lens, we know this statute must be viewed narrowly, not expansively, as Philmon would argue. Then we go to the language of 111F3. It says, Cable system is a facility, and I think that's important, it is a facility located in any state that in whole or in part receives broadcast signals or programs and makes secondary transmissions of signals or programs by wires, cables, microwave, or other communication channels to subscribers. Now, why isn't the technology used by Philmon substantially similar to the technologies that are considered cable systems in light of that provision you just cited? Completely different, yes, Your Honor, and that gets right to the nub of it. So first of all, the Internet is not a facility. The Internet is not a physical, tangible thing. It is simply a global interconnection of computers, as many courts have found, ACLU versus Reno, the IV-2 court, et cetera. So we know that the Internet can't even be a facility. It's not even a tangible, physical entity. We also know the Internet is not located in any state. It's global. There is really no location, per se, to the Internet. That's why it's represented as cloud or cyberspace, typically. We also know that the Internet is not Philmon's facility. They don't even contend that the Internet is their facility, and no court has ever held that the Internet is anyone's facility. But it is the Internet that transmits to their subscribers. So the transmission of programming to their subscribers is done by the Internet, but we know it's not their facility. They don't even contend that. There is no Philmon facility that makes retransmissions to its subscribers. And it would make no sense to define a cable system as a combination of technologies that are owned by different entities. Philmon is saying it's Philmon plus the Internet, which it doesn't own or control, equals a cable system. That is completely the opposite of the statute. Now we get to the second part. So we know it's not located in any state. We know it's not a tangible entity that could be a facility, and we know it's not Philmon's facility. So now we go to, well, even if we were to assume that hypothetically, Philmon has to make use of a communications channel. It fails that test for several reasons. First of all, as the Fox Television court, Judge Collier, found, the Internet is not a communications channel at all. It has no bandwidth, no throughput or noise, and that's undisputed in this record. In footnote 6 of Judge Kerkhorse's opinion, he provides the record evidence that Philmon isn't disputing the fact the Internet does not have the qualities of a communications channel, which is bandwidth, throughput or noise. In the IV-2 case, they cited many authorities that said there's no central storage location in the Internet, there's no control point, and there's no communications channel. And when you think about it, the Internet is not a channel at all. When you think about a communications channel, like a wire, you know where the beginning is. There's a defined path that the communication follows, and then there's an endpoint that's controlled by the person doing the transmissions. Well, there's no channel in the Internet. A message can go to Prague and back to Florida and to California one time, or it can go from New York to Chicago and China and back. I mean, it is a global, dispersed connection of computers. So it by definition cannot be a communications channel, and certainly not within the meaning of the statute. Now, remember, we have other communications channels preceded by the terms wires, cables, and microwave. The Copyright Office has found that those are all inherently localized mediums of transmission, of limited availability. Well, what would Congress need to do to bring the, I guess, if possible, put the Internet where it would be, I guess, labeled a facility or a device that, the word I would use that it's not a broad look at the Internet, but it's like kind of a funnel that goes to their, somehow brings in only what they want to their customers. You know, I think we can understand exactly how Congress would treat that, because we have the example of satellite. I mean, satellite is much closer to cable than the Internet, yet Congress provided an entirely separate statute for satellite. And frankly, in Section 122.1, Congress actually stated its intent and said satellite retransmitters cannot avail themselves of Section 111. They are limited to 119 and 122. So that's right in the statute. So there's no clear evidence of Congress's intent. But Congress looked at satellite and said, well, wait a second. This is not inherently localized. It's a satellite up in space. It's not located in any state. The Internet is the same. It's actually even global, at least for satellite. It actually ends up down on someone's television as sort of akin to a cable system, whereas the Internet doesn't even do that. So I think if Congress were to look at this, and given Congress's knowledge that the Copyright Office for two decades now has interpreted Section 111 as prohibiting. They don't like anything very much, actually. No, I think they do. I mean, what they've done is, I mean, again, there isn't this antipathy to the Internet generally. What it is is they've looked at what Congress did, and there's a clear legislative history that when Congress passed Section 111F3, it was dealing with an industry-specific compulsory license. And in both the House report and Senate report, they said a typical cable system has a central antenna which receives signals, and it then transmits them over a network of cables to the receiving sets. And with that history, and then the Copyright Office has studied the language of the Act, and if you look, and that's another thing, if you look at the overall statutory scheme, it's very local. In fact, Congress, in the Shivera report of 2004, specifically distinguished cable as being local in character versus satellite, which is national, and that is the reason Congress created two separate compulsory licenses in Congress's own words. And if you look at the other sections of Section 111, subsections, excuse me, it speaks in terms of contiguous communities, communities served. It refers to programming within whose local service area the cable system is located. So it's replete with references to community, communities, communities which are served, local service area. Those are all concepts that are local in nature, and the Internet is the antithesis of that. The Internet is intangible. It's global. It's completely unregulated. It's uncontrolled by anyone. So the Copyright Office has looked at that repeatedly, and, in fact, that's why the Copyright Office said, well, wait a second, this is very local. We've studied the statute. We've studied the legislative history. Satellite, you should get your own separate compulsory license. Congress ended up agreeing with that and passing that. Congress has been aware of the Copyright Office's interpretation of Section 111 for decades now. Senators Hatch and Leahy discussed it openly in the congressional record. There's been several lawsuits. And Section 111 has been amended four times in the last ten years. So this statute has been revisited by Congress repeatedly, and despite knowing of the Copyright Office's interpretation, despite knowing of the court's decisions, for example, IV-2 came down in 2012, the last amendment for 111 is 2014, yet Congress has never amended the statute to repeal or overturn the Copyright Office's interpretation that Internet retransmitters cannot avail themselves of the compulsory license. Well, I keep going back to this. How do we talk about channeling something? And what can Congress do? Because the Internet's not going away. It's expansive. And it seems to me that you can't ignore it. Now they're using it, and you're saying, well, yeah, but that's not a facility or whatever it needs to be to fit under this. It doesn't channel because it's ubiquitous. And then I use the word funnel simply because it does at least concentrate. I guess another question would be how does it localize, if that's what it's got to be? I don't think the Internet could ever be localized. And I think there has been sort of benign neglect of the Internet by Congress, the reason being, if you look at the reason for the compulsory license for cable systems, cable systems were heavily regulated. For a long time they were not violating copyright. They were required to carry certain channels by the FCC. They invested in infrastructure to serve rural communities that could not otherwise get signals. They were performing a service that broadcasters couldn't do themselves. So that's why Congress looked at this and said, okay, we've now changed the law. If you are transmitting, you're violating the Copyright Act. But, you know, it is going to be, you know, economically infeasible, practically impossible for you to have individual negotiations to carry all of this program that you're required to carry, and you've made all these investments and you're doing something broadcasters can't do. The Internet is completely different. Broadcasters, such as my client, can actually directly transmit over the Internet if they so choose. So Philmon and others aren't providing anything they can't. Philmon is not serving underserved communities. Philmon has not made any investment in infrastructure like the cable companies did. And unlike the cable companies where you had essentially a market failure for this licensing regime, for the Internet there is a robust, ubiquitous market for negotiated licenses, and that's why you have cable companies or AT&T who can give you television in two ways, over your television, kind of I'll call it the old way, or over your phone through an Internet streaming license, Hulu, Amazon. Netflix. They all negotiate licenses. So I think that's why Congress would never step in, because the market's working. And the reason that's important, Your Honor, is because as you pointed out it's this kind of odd funnel and how could the Internet really ever be localized? Indeed, how could the Internet ever really be regulated, for example? I mean, that's a real issue. Yeah, but it's not going away, that's for sure. Exactly. It's here to stay. So I think what Congress would do is say, well, we would prefer market negotiated licenses rather than a government-imposed, one-size-fits-all compulsory license. So your bottom line really is a service that captures copyright-protected broadcasts and then re-transmits them over the Internet is not a cable system, right? That is correct. And so it violates the principles of copyright law as well as the public policy and the intent of Congress underlying the statute that we're interpreting. Absolutely. They absolutely do not fit within the compulsory license. They then have to go into the marketplace, like everyone else, and attempt to negotiate licenses. And the reason that's important is because of the sort of uncontrolled, unregulated global nature of the Internet. When you negotiate a license, you can then, as a copyright owner, you can then impose strict requirements on anti-piracy, on where you'll do it, strict requirements on how you will limit what you do. You can then negotiate a licensee that takes into account this uncertainty when stuff goes over the Internet. Because otherwise we'd be in a situation where anybody could provide this kind of service without basically regulation. That's absolutely right. In fact, if you take their interpretation of the compulsory license to its logical conclusion, anyone with an antenna and an Internet connection is now a cable system who automatically gets a government license and with whom the copyright holder has no interaction. So, yes, it becomes literally the Wild West. And as the Copyright Office has pointed out, when things go on the Internet, we're talking digital copies, I mean, the anti-piracy scheme that is perfect has not been invented yet, and so a copy can go over the Internet literally globally overnight and it's a perfect copy. So the piracy risks are enormous with respect to the Internet, unlike with respect to the cable systems. Remember, the reason Congress in large part gave them the compulsory license is not only the investment, et cetera, but they had a point-to-point controlled transmission. Remember, a cable system is a facility that does two things. It receives the signals and it transmits them to subscribers over limited communications channels. So if you do that from point A to point B over a wire, you know where it started, you know where it's ending up, and you know that localized path. See, it all comes back to control. I think it does. And that gap, you know, it's not a wire, it's not whatever, and that's why I'm not sure how you... I invented the word funnel. I didn't read it anywhere, but it just seems that that's one way you concentrate this whole global Internet for a specific purpose. Now, I understand why, you know, maybe the office, as they nickname it, doesn't like a lot of this stuff because they're trying to protect copyright and property, which is very important. But I'm just wondering, what is Philmont supposed to do in order to exist, or does it say it just can't exist? The same thing that Hulu, Netflix, Amazon, the cable companies have done with respect to Internet streaming, you know, attempt to negotiate licenses. So they have a specific license for everything that they transmit. Yes, there are negotiated licenses that cover the programming, the conditions on which it'll be streamed. Unless it's original programming by Amazon and Hulu, because then they have the control over that, but it's programming from other sources. Right, but interestingly, even they include, you know, robust anti-piracy for their own programming, which is, you know, something that somebody can say I will do, but there's no legal restrictions if it's a compulsory license. And to get back to your question, Your Honor, on the funnel, the problem with that is in the Internet, it's actually not a funnel, it's many funnels. So a message can go one path one day, it can go a different path a different day. Parts of that message can actually take different paths and get recombined at the end, and there is absolutely no control by any particular entity over the Internet. It's simply a global connection of computers. Now, it's a very useful thing, obviously, but when you're dealing with a government-imposed compulsory license, it's sort of the antithesis of what Congress envisioned in the cable system compulsory license, and we know that because of what they did with respect to satellite. I mean, they have really no answer to this. Very quickly, and if you even conclude the language is ambiguous, we win on all the tiebreakers. Charming Betsy, if it's interpreted the way they want, we're in violation of numerous treaties. There's the presumption against the compulsory license. There's a deference to the Copyright Office. There's congressional acquiescence in the position of the Copyright Office. All of these tiebreakers, they would have to run the table to prevail here, and every single one of these tiebreakers, even if you were to determine the language is ambiguous, which we don't believe it is. We believe it's unambiguous in our favor. Every single tiebreaker. Did you say not ambiguous in your favor? In our favor, yes, and I've gone through Y facility, located in East State Communications Channel, and the context. You have to look at it. The overall statutory scheme also informs plain meaning. But you look at communities within a local space, and I see my time is up. Thank you very much. Thank you, Mr. Stone. Mr. Baker? Thank you, Your Honors. I'd like to respond to a few of the points that were made by Mr. Stone. First, it's interesting that throughout the opinion from the district court and throughout the papers submitted by the appellee in this case, there's a constant effort to insert terms into the statutory language. And we even heard it just now where Mr. Stone said, not just communications channels or other communications channels, he said limited communications channels. And this is what the networks in the other cases and WTW here have tried to do, and some of the courts have followed down that path. They've followed a case that's really distinguishable as well, IPI, and they've concluded that there must be some other control of that transmission path, but that's not in the statute. And, again, the FCC exists. Sure, Your Honor. Mr. Baker, is it your position that it would be unfair in reading the various subsections of 111 to not conclude that the terms owns or controls is suggestive of a person or an entity? I'm sorry, Your Honor? When they speak of owns or controls, doesn't that suggest a person or an entity? It does, Your Honor. Okay. So describe your entity and contrast that to what has been traditionally viewed as the cable system. Sure. So the entity that is film on X has a facility, which is literally in a building. It's a structure. And that facility has an antenna that receives signals. So you own that facility? Own or lease, yes. There's some property right there that film on X has. And what is your control? So we own and operate an antenna, and then contrary to what Mr. Stone said, it's more than just an antenna and a computer. There's equipment that encodes the signal that's received and sends it out onto the Internet in packets. So there's software and code that's written to do that. So the equipment, the facility, receives the signal and then retransmits the signal. And it retransmits the signal using wires and cables, and then that signal travels onto the Internet. And it only is received by an end user who has software that's been provided by film on X, which enables only that end user to decode and then view the transmission. And it's not at all dissimilar to microwaves. And even in the papers that have been submitted by the Appli, they argue that microwaves are okay because there's a transmitter and a receiver. And the receiver, once it receives the signal, is somehow, there's some control either by the end user or by the transmitter. It's the same here. We're not traveling over the airwaves like a microwave. We're traveling over the Internet and, again, only reaching the end user. Was it possible then to have some sort of a contract or license or whatever to, when you pull it out of the Internet, you meaning your client, then it is specific. Is that an opportunity for them to get a license or copyright, whatever it takes to be able to use their product? I mean, at that point, I use the funnel again. When you get it, when you funnel it in, is there then a point where you have to pay for it or you have to get an agreement or some other acknowledgment and agreement from the owner? Yes, Your Honor. Under the compulsory license regime, we pay license fees based on the number of retransmissions that are made to end users. So once you have that license, once you have the compulsory license, then there are a number of other requirements that go with that. Correct. But you have to, in order to make sure that the owner of that copyrighted material gets paid. That's correct. And briefly, I know my time is up. I'll give you an answer. Okay, thank you. A couple of quick points. The Pandora's box or the parade of horribles that somehow this is going to undo the meaning of the statute and copyright is going to evaporate is simply make-believe. It's not true. Again, all we're asking the court to do is apply the plain language of the statute. If Congress wants to step in and amend the statute, it certainly could. It's had an opportunity. It's been presented with the Copyright Office's view for many times. In fact, there was legislation on the table to exclude the Internet, and it did not enact that legislation. Well, you certainly don't want that. You're right, Your Honor. You're right, Your Honor. Although the other is what I asked you before. What can Congress do that would be okay with you? I don't want to go to that. It doesn't need to do anything. To be honest, my answer is it's already done what it needs to do. All right. And to the extent there are other issues that might raise concerns, the FCC is poised. It's there. It's ready to regulate. This is not just any kid with an antenna. These are complicated equipments. Based on the record before this court, there's evidence of the money that's been spent to build these things. Again, the same situation has occurred in 1976. It's just a different technology. As Your Honor has acknowledged, there's no secret the Copyright Office is going to be animus towards this, towards any intrusion. But this is one that's explicitly permitted by the statute. This court should reverse the district court and remand the case for further proceedings. Thank you very much. Thank you, Mr. Baker. Thank you, Mr. Stone. The case is taken under advisement.